**2026 UT App 105**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF M.M.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

M.M.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20250665-CA
Filed July 16, 2026

Second District Juvenile Court, Ogden Department
The Honorable Rick T. Westmoreland
No. 1191183

Emily Adams, Anna Grigsby, and Monica Maio,
Attorneys for Appellant

Derek E. Brown and Jason E. Greene,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1 After adjudicating M.M. delinquent on multiple misdemeanors, the juvenile court placed him in the custody of Juvenile Justice and Youth Services (JJYS). M.M. now appeals the court's decision to place him in custody, asserting that the decision was statutorily impermissible and that his attorney (Counsel) rendered constitutionally ineffective assistance by failing to argue that a custody decision was statutorily barred.

¶2 M.M. acknowledges, however, that this issue has been rendered moot because he is no longer in custody on these charges. M.M. asks us to address the issue anyway, pursuant to an exception to the mootness doctrine. In our view, however, this exception does not apply in this case, because the precise issue raised by M.M.—whether Counsel rendered ineffective assistance on the specific facts presented here—is unlikely to recur in the future. We therefore dismiss M.M.'s appeal as moot.

BACKGROUND[1]

¶3 In September 2024, the State filed a petition against M.M.—who was fourteen years old at the time—alleging that he had committed retail theft (a class B misdemeanor) and had failed to stop at the command of a police officer (a class A misdemeanor). We refer to this as the First Retail Incident. M.M. later admitted to the State's allegations, and the juvenile court adjudicated him delinquent. The court then placed him on house arrest "until released by further court order," ordering him to remain "at home when not in school" and specifying that "[l]ack of [school] attendance [would] constitute a home detention violation."

¶4 About a week later, the court held a review hearing at which M.M.'s probation officer (Probation Officer) informed the court that M.M. "ha[d] not attended school all week" and that she had "concerns other than truancy that she [felt] merit[ed] home detention with electronic monitoring." She also suggested that if the court did not believe that M.M. was qualified for house arrest with electronic monitoring, then it should place him "in detention." The court deferred ruling on the issue and scheduled another hearing for a few weeks later. At that hearing, Probation Officer reiterated her concerns and asked the court to order that

---

1. "We recite the facts in the light most favorable to the juvenile court findings." *In re R.G.*, 2023 UT App 144, n.1, 540 P.3d 1148 (cleaned up).

M.M. be taken into detention. The court agreed with that recommendation and ordered that M.M. be "committed to detention for a period of thirty days to commence immediately," with an additional thirty days of house arrest to follow. In addition, the court ordered M.M. to, among other things, "attend and successfully complete [the] Weber Human Services Early Psychosis program."

¶5 M.M. served his thirty days in detention. But soon after starting his thirty days of house arrest, he violated the terms of the court's order by leaving home without permission on multiple occasions. During this same time period, M.M. met with Probation Officer while "under the influence of an intoxicating substance," later admitting to having "us[ed] a dab on the way to the courthouse." In response to these actions, the State asked the court to require M.M. to appear before the court and "show cause why [he] should not be found in contempt of court." At a hearing on the issue, M.M. admitted to the allegations and received his first adjudication for contempt of court (Contempt 1). As a sanction, the court ordered M.M. to serve three days in detention followed by fourteen additional days of house arrest and continued formal probation, among other things.

¶6 M.M. served his three days in detention, and when he returned home, he violated the terms of his house arrest almost immediately by missing an appointment with Weber Human Services. A few days later, he was about thirty minutes late for a probation appointment, didn't return home by the required time, and failed to schedule a subsequent probation appointment. Additionally, during the fourteen-day house-arrest period, he left home without permission on at least six of those days. In response to these actions, the State filed another request for an order to show cause (Contempt 2), and the court set a hearing to consider these new issues. Before that hearing could take place, the State filed yet another request for an order to show cause, this time alleging that M.M. had failed to attend another appointment with

Weber Human Services, refused to attend school, violated a curfew set by Probation Officer, and vaped marijuana in a Youth Services program lobby, resulting in his termination from the program (Contempt 3).

¶7    At a hearing on Contempts 2 and 3, M.M. admitted to the allegations, and the court placed him on house arrest for another fourteen days[2] and scheduled a review hearing to take place later. That same day, following the hearing, M.M. left home without permission, and the next morning he was absent from school. In response to these two new violations, the State filed two additional requests for orders to show cause (Contempts 4 and 5), which the court granted, and M.M. eventually admitted to these allegations as well.

¶8    In addition to all of this, on the day after the hearing on Contempts 2 and 3, M.M. jumped through a fast-food restaurant's drive-thru window and attempted to pry open a locked cash register. The police were called, and a responding officer (Officer) saw M.M. and commanded him to stop. M.M. refused to comply with this command, instead "turning and running the other way." Officer chased M.M. "on foot for several blocks," eventually catching up to him and grabbing him by the legs. M.M. then punched Officer in the arm. M.M. was subdued and arrested, and he was later charged with failing to stop at the command of a police officer, interference with an arresting officer, assault on a police officer, and attempted burglary (collectively, the Fast-Food Incident).[3] M.M. later admitted to most of the charges stemming

---

2. The court also committed M.M. to immediate detention for six days but gave him credit for time served.

3. M.M. was also charged with possession of a controlled substance, but that charge was later dropped.

from the Fast-Food Incident, and after temporary detention in JJYS custody, he was once again placed on house arrest.

¶9     A few weeks later, the State charged M.M. with a new count of retail theft, a class A misdemeanor[4] (the Second Retail Incident), and it placed M.M. in temporary JJYS custody. At a hearing on this new charge, M.M. denied the retail theft allegation, and the court stated its preference to "hold disposition" for the Fast-Food Incident and Contempts 4 and 5 until the Second Retail Incident had been adjudicated "so that disposition [could] be completed at one time." Consistent with this preference, the court ordered M.M. to remain in detention, and it set the matters for a pretrial and disposition hearing.

¶10    In preparation for the disposition hearing, the court requested that "counsel review and discuss the possibility of contempt findings qualifying as misdemeanor adjudications" for purposes of assessing whether M.M. should be committed to custody, and it asked the parties to "be ready to address this at the next hearing." *See* Utah Code § 80-6-703(2)(b)(ii) ("If a minor is adjudicated [delinquent] under [this section], the juvenile court shall only commit the minor to the division . . . if . . . the minor is adjudicated under this chapter for . . . a misdemeanor when the minor has five prior misdemeanors or felony adjudications arising from separate criminal episodes . . . ."). Before the hearing, the State filed a memorandum in response to the court's request, stating its position that "contempt of court adjudications and probation violations likely cannot be considered misdemeanor violations for purposes of determining whether [M.M.] may be committed to" detention. And the State argued that M.M. therefore did not yet qualify for commitment to JJYS custody because he did "not have the requisite number of misdemeanor

---

4. This count was originally charged as a class B misdemeanor, but it was later upgraded to a class A misdemeanor due to the existence of prior qualifying offenses.

adjudications." Counsel did not file a memorandum on the subject on M.M.'s behalf, either in response to the court's suggestion or in response to the State's memorandum.

¶11 The court began the disposition hearing by addressing whether it had the authority to place M.M. in JJYS custody, expressing "heartburn" about the issue and, in particular, about interpreting the relevant statute. As noted, that statute allows a court to place a juvenile into custody only if the juvenile has been "adjudicated . . . for . . . a misdemeanor when the minor has five prior misdemeanors or felony adjudications arising from separate criminal episodes." *Id.* M.M. had certainly been adjudicated for a misdemeanor. So the relevant question was whether, under the statute, M.M. had "five prior misdemeanors or felony adjudications arising from separate criminal episodes." *Id.* And here, this question turned on whether M.M.'s many adjudications for contempt could count as "prior misdemeanors . . . arising from separate criminal episodes." *Id.*

¶12 The court explained that, in attempting to interpret that statute, it had located an unpublished appellate opinion—*State v. Wheeler*, 2005 UT App 255U—that it believed supported the notion that contempt adjudications could count as "prior misdemeanors" for purposes of determining whether to place M.M. in custody. During the ensuing argument, Counsel did not take a position on whether the court had authority to commit M.M. to JJYS custody based on the prior contempt adjudications, but Counsel did raise concerns that M.M. had not been given adequate notice before being put into detention. Counsel's position at the hearing was that M.M. should be again placed on probation in keeping with Probation Officer's recommendations. For her part, Probation Officer did not agree with the court's position that the contempt adjudications could count as prior misdemeanors that could satisfy the statutory requirement, but she stated that she would be "okay with whatever" the court decided to do. The State did not present further argument on the

issue, beyond what it had already stated in its written filing, and said it would also submit to the court's ruling.

¶13   After hearing the parties' positions, the court concluded that M.M.'s prior contempt adjudications could qualify as prior misdemeanors and that it therefore had authority, under the circumstances, to place M.M. in JJYS custody. Based on this interpretation of the statute, the court ordered that M.M. be placed in JJYS custody for disposition of the Fast-Food Incident, and it ordered M.M. to serve three days of detention each for Contempts 4 and 5, with credit for time served. The court then terminated probation for all prior incidents, marking them as unsuccessful and closing out the matters.

¶14   Following placement into custody, M.M. admitted the allegations stemming from the Second Retail Incident, and the court committed him to additional JJYS custody for disposition of that incident. And although this fact is not clear from the record submitted to us, the parties agree, in their briefing, that M.M. is no longer in custody related to the First Retail Incident, the Fast-Food Incident, or any of the contempt adjudications.

ISSUES AND STANDARD OF REVIEW

¶15   M.M. now appeals the juvenile court's decision to place him into JJYS custody following the disposition hearing on the Fast-Food Incident and Contempts 4 and 5. As M.M. sees it, the underlying problem with the court's decision is that the court interpreted the governing statute incorrectly. But all parties to this appeal agree that M.M. failed to properly preserve any objection to the argument that the statute allows for contempt adjudications to count as prior misdemeanors.[5] In light of this, M.M. asks us to

---

5. The preservation question is certainly closer than the parties make it appear. The juvenile court asked for briefing and

(continued…)

review the statutory interpretation issue through one of the exceptions to our preservation doctrine: ineffective assistance of counsel. A claim of ineffective assistance presents a question of law, "which we determine in the first instance as a matter of law." *State v. Thomas*, 2025 UT App 145, ¶ 15, 579 P.3d 416.

¶16    But before we confront the merits of the ineffective assistance question, we must address the State's assertion that the appeal has been rendered moot by the fact that M.M. is no longer in custody on the relevant charges. In response, M.M. acknowledges that subsequent events have rendered his appeal moot, but he contends that we should nonetheless reach the merits of his ineffective assistance claim under an exception to the mootness doctrine. Because an appellate mootness issue, by definition, arises for the first time on appeal, "our decision is not governed by any standard of review, and we decide the matter as

---

argument on the relevant statutory interpretation question, and then it made a square ruling on that point after considering the parties' input. There is a decent argument to be made that the question was indeed preserved. *See State v. Ramos*, 2025 UT App 70, ¶ 11 n.1, 571 P.3d 807 ("The main point of our preservation rules is to afford a trial court the opportunity to rule on a disputed issue, and where a trial court actually makes a ruling on an issue, it has had that opportunity." (cleaned up)), *cert. denied*, 574 P.3d 525 (Utah 2025). We acknowledge, however, that Counsel didn't object to or oppose the court's musings, and non-opposition is often the foundation for a determination that a matter has not been properly preserved. *See Bluffdale City v. Verive*, 2026 UT App 101, ¶¶ 38–47 (holding that an issue was not properly preserved for appellate review, even though the trial court eventually relied on the evidence in question, when the attorney failed to lodge a proper objection to the admission of the evidence). We need not delve deeper here, though, because the parties agree that the issue is unpreserved, and we follow their lead on that point.

a question of law." *Grewal v. Junction Market Fairview, L.C.*, 2024 UT 20, ¶ 12, 554 P.3d 863 (cleaned up).

ANALYSIS

¶17 In this appeal, M.M. seeks to challenge the juvenile court's decision to place him in custody. But all parties agree that M.M. is no longer in custody on the charges at issue here. And all parties agree that this fact renders M.M.'s appellate challenge moot unless an exception to our mootness doctrine applies. After all, "an appeal is moot if during the pendency of the appeal circumstances change so that the controversy is eliminated, thereby rendering the relief requested impossible or of no legal effect." *Utah Transit Auth. v. Local 382 of Amalgamated Transit Union*, 2012 UT 75, ¶ 14, 289 P.3d 582 (cleaned up). And here, circumstances have changed, because M.M. is no longer in custody on the relevant charges, and therefore the controversy M.M. wishes to bring to our attention—whether the court was barred from placing him in custody—has been eliminated, rendering the relief he seeks impossible or of no legal effect.

¶18 "The doctrine of mootness is not a mere matter of convenience or judicial discretion." *State v. Dowhaniuk*, 2025 UT App 100, ¶ 33, 574 P.3d 1000 (cleaned up). Rather, the doctrine "is a constitutional principle that implicates our judicial power to adjudicate cases," and if an issue has been "rendered moot by subsequent events," courts are powerless to hear the issue unless an exception to the mootness doctrine applies. *Id.* (cleaned up); *accord Ramirez v. Landau*, 2026 UT App 17, ¶ 15, 586 P.3d 536.

¶19 In this case, M.M. invokes an exception to the mootness doctrine, and he asks us to consider the merits of his appellate challenge despite its mootness. The exception M.M. points to here has three elements: "(1) the case must present an issue that affects the public interest; (2) the issue presented must be likely to recur in the future; and (3) the issue must be one that . . . is likely to

evade review in the future." *State v. Seat*, 2022 UT App 143, ¶ 33, 523 P.3d 724 (cleaned up). "The burden of demonstrating the existence of these elements falls upon the party invoking the exception." *Ramirez*, 2026 UT App 17, ¶ 15.

¶20 As is evident from the three elements just recited, the applicability of this exception is analyzed on an issue-by-issue basis. *See Seat*, 2022 UT App 143, ¶ 33; *see also Mukhtar v. Lambrecht*, 172 F.4th 836, 842 (10th Cir. 2026) ("In assessing mootness, [appellate courts] take a claim-by-claim approach and decide whether a case is moot as to each form of relief sought."(cleaned up)); *Harman v. 105 Partners, LLC*, 2024 UT App 109, ¶ 26, 556 P.3d 669 (explaining that "the mootness doctrine largely turns on the continuing availability of the relief requested," and that "Utah's mootness cases have commonly looked to the precise terms of the plaintiff's pleadings . . . to determine the nature of the requested relief" (cleaned up)); Utah R. App. P. 37(a) (indicating that circumstances may render moot "one or more of the *issues*" an appellant attempts to raise on appeal (emphasis added)). We must therefore examine M.M.'s appellate claims to ascertain what the precise issue is that he brings to us for review.

¶21 M.M. attempts to frame the pertinent issue as one of statutory interpretation. In particular, he argues that his grievance centers on the "interpretation of a statute," namely, the provision that allows a court to place a juvenile into custody only if the juvenile has been "adjudicated . . . for . . . a misdemeanor when the minor has five prior misdemeanors or felony adjudications arising from separate criminal episodes." *See* Utah Code § 80-6-703(2)(b)(ii). He urges us to interpret this statute and give guidance to "attorneys and juvenile courts" about "when and how" juveniles can be committed to custody in similar situations.

¶22 But as noted, all parties agree that M.M. failed to properly preserve the statutory interpretation issue for appellate review. Thus, while M.M.'s underlying grievance is indeed that the

juvenile court misinterpreted the statute, here on appeal we are permitted to assess that issue only through the exceptions to our preservation rules, and M.M. therefore asks us to interpret the statute through the lens of ineffective assistance of counsel. And it almost goes without saying that the issue of whether Counsel rendered ineffective assistance by not registering opposition to the juvenile court's analysis is not the same as the raw statutory interpretation issue—whether the court interpreted the statute correctly. Indeed, "[i]neffective assistance of counsel . . . is a stand-alone constitutional claim attacking the performance of a criminal defendant's counsel." *State v. Johnson*, 2017 UT 76, ¶ 22, 416 P.3d 443. And "[w]hile such a claim necessarily requires the court to look at the substantive issue the defendant argues his [or her] counsel should have raised, and whether the substantive issue had any merit, the substantive issue is only viewed through the lens of counsel's performance." *Id.*; *see also Archuleta v. Galetka*, 2011 UT 73, ¶ 32, 267 P.3d 232 ("The mere allegation of ineffective assistance is not enough alone to revive the substantive claim.").

¶23 Indeed, an ineffective assistance of counsel claim has its own elements, and these are separate from the merits of the underlying issue, whatever it might be in a given case. To mount a successful ineffective assistance claim, defendants must make a two-part showing: that (1) their attorney's performance was deficient and (2) this "deficient performance prejudiced the defense" by giving rise to "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). The first prong of this analysis involves an assessment of the objective reasonableness of counsel's actions, *see State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350, and it "requires the defendant to show 'that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment,'" *State v. Grunwald*, 2020 UT 40, ¶ 19, 478 P.3d 1 (quoting *Strickland*, 466 U.S. at 687). "And the second prong requires the defendant to show that 'counsel's

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). These elements are, of course, much different from simply assessing whether the juvenile court correctly interpreted the statutory provisions at issue.

¶24 Having thus identified the issue at hand as one of ineffective assistance of counsel (and not merely one of statutory interpretation), we now proceed to evaluate M.M.'s assertion that the three elements of the mootness exception apply to this issue. We agree with the State that the elements are not all satisfied.

¶25 The State focuses its resistance to M.M.'s position on the second element of the exception: whether the issue is "likely to recur in the future."[6] *See Seat*, 2022 UT App 143, ¶ 33 (cleaned up). On this point, the State argues that M.M. has fallen far short of demonstrating that, in the future, attorneys in Counsel's position will be likely to fail to object if the State (or, as here, the court itself) advances an argument that the relevant statutory provisions allow a juvenile to be placed in custody under circumstances similar to those present here. The State's argument is well-taken.

¶26 In order to prevail on his ineffective assistance claim, M.M. must demonstrate that Counsel performed deficiently in this case. Deficient performance occurs when "counsel's act or omission [falls] below an objective standard of reasonableness." *State v. Ray*,

---

6. We also wonder whether the first element is met here. Given that the issue here is not one of raw statutory interpretation but, instead, whether Counsel rendered ineffective assistance on the specific facts of this case, there is a good argument to be made that this appeal presents only a fact-specific issue that does not "affect[] the public interest." *See Utah Transit Auth. v. Local 382 of Amalgamated Transit Union*, 2012 UT 75, ¶ 32, 289 P.3d 582. But because the State does not advance this argument, we offer no further analysis on the point.

2020 UT 12, ¶ 36, 469 P.3d 871. And as already noted, to prevail on this part of his claim, M.M. must show that "counsel made errors so serious that counsel was not functioning as the counsel guaranteed [him] by the Sixth Amendment." *See Grunwald*, 2020 UT 40, ¶ 19 (cleaned up). We of course must start with the premise—as the *Strickland* court did—that most attorneys act reasonably most of the time. *See* 466 U.S. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."). And we note that "[s]urmounting" the *Strickland* standard, and demonstrating ineffective assistance, is a "high bar." *See Padilla v. Kentucky*, 559 U.S. 356, 371 (2010); *see also Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986) (noting that the *Strickland* standard, "although by no means insurmountable, is highly demanding").

¶27     But here, if we assume—for purposes of our analysis only and without deciding—that Counsel's performance was objectively unreasonable, it necessarily follows that such behavior would be quite unlikely to recur in future similar cases. An issue satisfies the likely-to-recur prong of the mootness exception only if there is "a reasonable expectation or a demonstrated probability that the same controversy will recur." *Utah Transit Auth.*, 2012 UT 75, ¶ 36 (cleaned up). And unreasonable attorney behavior is, almost by definition, unlikely to recur in the future.[7] In particular,

---

7. M.M. resists this point by directing our attention to three appellate opinions from Illinois that he believes stand for the proposition that ineffective assistance claims can be likely to recur. As an initial matter, those cases are not binding on this court, and M.M. cites no Utah law on this point. And substantively, these cases are readily distinguishable. All three of them involve a specific Illinois statute regarding involuntary commitment of mentally ill individuals, which statute contains specific procedural requirements that must be met before an individual may be committed. *See In re Leo M.*, 2022 IL App (5th)

(continued…)

and as applied to this case, it does not seem likely, or even probable, that an attorney in a similar position in the future will fail to oppose an argument that a juvenile's prior contempt adjudications can qualify as prior misdemeanors for purposes of assessing whether the juvenile can be placed into custody pursuant to relevant statutory provisions. *See* Utah Code § 80-6-703(2)(b)(ii).

¶28    Moreover, ineffective assistance claims are by nature quite fact-specific, not only as concerns the assessment of whether an attorney performed reasonably under the circumstances but also as concerns the assessment of whether any prejudice resulted to that particular defendant in that particular case. We view it as extremely unlikely, if possible at all, that this precise issue—whether this attorney rendered ineffective assistance under these specific circumstances—will ever recur in the future.

¶29    At some point, a reasonable attorney will preserve for appellate review the question of whether a juvenile's prior contempt adjudications can qualify as prior misdemeanors for purposes of assessing whether the juvenile can be placed into custody pursuant to relevant statutory provisions. And when that occurs, the statutory interpretation issue that underlies this case will be squarely presented for appellate guidance. But that is not the issue M.M. raises. The issue presented here—whether Counsel

---

190211, ¶ 29, 217 N.E.3d 239; *In re Tara S.*, 2017 IL App (3d) 160357, ¶ 17, 83 N.E.3d 528; *In re Sharon H.*, 2016 IL App (3d) 140980, ¶ 33, 52 N.E.3d 698. None of the cases contains much analysis about whether unreasonable attorney behavior can be considered likely to recur. And two of the cases involve application of a mootness exception much different from the exception at issue here: an exception for cases in which there is "a reasonable expectation that the same complaining party would be subject to the same action again." *See In re Leo M.*, 2022 IL App (5th) 190211, ¶ 25; *accord In re Tara S.*, 2017 IL App (3d) 160357, ¶ 16.

rendered ineffective assistance on the specific facts of this case—is not one that is likely to recur in the future.

¶30 Accordingly, M.M. has not carried his burden of demonstrating the applicability of the exception to the mootness doctrine.

CONCLUSION

¶31 The issue M.M. brings to us for adjudication on appeal—whether Counsel rendered ineffective assistance—has been rendered moot, and M.M. has not demonstrated that an exception to the mootness doctrine should be applied here. We therefore lack jurisdiction to adjudicate M.M.'s appeal, and we dismiss it on that basis.

_____